Filed 1/9/14  L.E. v. Super. Ct. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| L.E.,<br><br>　　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF HUMBOLDT COUNTY,<br><br>　　　　Respondents;<br><br>HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.<br><br>　　　　Real Party in Interest. | A139753<br><br>(Humboldt County<br>Super. Ct. No. JV120040) |

### I.  INTRODUCTION

Petitioner L.E., the mother of R.E., seeks extraordinary writ review of a juvenile court order entered at the conclusion of a contested 12-month review.  (Cal. Rules of Court, rules 8.400(a)(2), 8.452.) At that time, the juvenile court terminated Mother's reunification services and set the matter for a Welfare and Institutions Code section 366.26[1] hearing.  Mother challenges this order, arguing that the court erred when it did not extend reunifications services beyond 12 months.  We disagree and deny Mother's requested relief.

---

[1] All further statutory references are to the Welfare and institutions Code.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

R.E. was detained on March 9, 2012, when he was four years old after Mother and Father[2] were unable to care for him because of their substance abuse and mental health issues.  Mother was admitted to SemperVirens.  Father was later admitted to the same facility after he made statements including one about slitting R.E.'s throat.  Both Mother and Father had a history of methamphetamine use and psychiatric hospitalizations.

In its Detention Report, filed March 14, 2012, the Humboldt County Department of Health and Human Services reported that R.E. had been placed in a foster home after Father had made threats against him on March 9, 2012.  Father, who had a history of violence, including domestic abuse against Mother, went to Psychiatric Emergency services where, in addition to threats against R.E., he also stated that it made him "happy to think about killing and hurting other people."

The Department reported 10 referrals regarding R.E. between April 23, 2007 and March 9, 2012.  Six of these referrals were assigned for investigation, beginning with a report of general neglect after R.E. testified positive for marijuana at birth.  In another reported incident, on November 7, 2011, a mandated reporter contacted the Department "to report the general neglect of [R.E.] by his parents.  [R.E.'s] maternal uncle reportedly disciplined him inappropriately which resulted in the mother and the uncle getting into a physical altercation.  The parents were described as low functioning due to extreme mental health issues.  The minor was seen and was dirty, smelled of feces, and had food crusted to his face.  The father appeared agitated and spoke unintelligibly at times.  The father smelled of marijuana.  The family had limited resources.  The referral was assigned for investigation and remains open."

At the time the petition was filed, the parents lived with R.E. in a tent on Mother's parent's property.

R.E. was detained, and the Department was ordered to provide Mother and Father with services, including parent education, drug monitoring and random drug screens, as

---

[2] Father is not a party to this proceeding.

well as counseling for Mother and Father and psychological evaluations for both. The court gave Mother and Father visitation twice a week for two hours.

The Department filed its Jurisdiction Report on April 4, 2012. R.E. remained placed in a locally licensed foster home. The social worker who was involved in placing R.E. in foster care reported that both parents had been frequently admitted to SemperVirens "with concerns of harming themselves." She reported that "[v]arious family members have reported hearing [R.E.] talk about killing himself. They feel this may be because of overhearing his parents making similar statements." The social worker "noted that [Mother] is able to redirect her son and husband in healthy appropriate ways when she is not severely depressed or suicidal."

The Department's ultimate assessment was that "[i]t is clear from the information from the investigation at the time of this child's birth through the information regarding the present situation that both parents struggle with issues of substance abuse and mental health concerns. It is also apparent that when each parent is in a clear and sober state, they recognize the danger to their son's mental and emotional health that their behavior when they are not in a clear and sober state presents to their son. It is imperative that they find ways to independently successfully address these issues so that their son can have a safe and emotionally healthy home in which to live."

On April 4, 2012, the court found by clear and convincing evidence that R.E. was a child described by section 300, subdivision (b) and sustained the petition.

In its disposition report dated May 9, 2012, the Department stated that Mother's "mental health issues include depression and/or bi-polar disorder. The mother also uses marijuana and methamphetamine, which complicates her mental health issues. The mother's depression is very serious and she has made suicide attempts and has talked about killing herself in front of her son. [¶] Neither parent has demonstrated any stability when the other parent is having mental health challenges, which leaves the child without an effective parent. Both parents have demonstrated an inability to monitor their own behavior and this has led to angry outbursts or physical altercations."

Moreover, the "parents lived in a tent on the maternal grandparents' property in Arcata at the time that the minor was detained. Previous referrals and information obtained through investigations indicate that the parents have had difficulty maintaining housing in the past. The father has associated with people who have either caused him physical harm or have not been positive influences in his life."

The parents had apparently attempted to engage in services to address their mental health disorders. Both parents acknowledged their mental health issues and are attempting to address these issues. However, "[t]hey have not stated an intention of stopping the use of marijuana, though acknowledge that the use of methamphetamine is not helpful to them. The parents have moved out to Honeydew with the paternal aunt in an attempt to stay sober, although it is probable that this intention does not cover marijuana."

With regard to visitation, "[i]n general, the parents struggle to maintain their behavior during their visits with [R.E.] The mother does a majority of the interacting with [R.E.] The father becomes agitated when he is unable to come in and out of the visit as he pleases. He often wants to leave to smoke a cigarette, which is against . . . policy. The parents seem to struggle visiting for two hours at a time. The parents come from Honeydew for visitation and it would be very difficult for them to come more often than two days a week. The visits are currently set up for two hours and the parents have difficulty using all of the time allotted. It is difficult to determine whether the visits should be scaled down to one hour twice a week so that the parents could show that they are meeting the visitation schedule, or to leave it for two hour visits and have the parents not be able to complete the visits." The court ordered reunification services to the parents and set the matter for a 90-day interim review hearing on July 17, 2012.

In her case plan, Mother was required to (1) engage in a psychological evaluation as well as any recommended services; (2) abstain from drugs, alcohol, and the use of non-prescribed medication; (3) engage in an alcohol and other drug (AOD) assessment and follow all recommendations; (4) demonstrate her ability to parent R.E.; and (5)

4

refrain from threats of suicide, emotional outbursts, or other behavior that would indicate she was not in control of her emotions.

At the six-month review hearing, Mother argued that she had not been provided with reasonable family reunification services because she had not been provided with a psychological evaluation. The matter was continued numerous times and ultimately on February 5, 2013, the court concluded that the Department had not offered Mother and Father reasonable services during the months of August, September and October. It did so based on the fact that a psychiatric evaluation had yet to be performed.

During this period of time, the Department had referred Mother to several programs and Mother was scheduled to start an "Early Recovery Group" in August. At the same time, Mother drug tested positive for marijuana. She then did not attend any groups for two months except on one occasion when she brought Father with her and said she could not leave him alone. After that, there was no further contact on Mother's part with these services. Mother was also referred to a Dual Diagnosis program by County Mental Health. She informed the social worker in late August that marijuana was her drug of choice, but that she could not locate her 215 card.

In addition to struggling with mental health and substance abuse issues, Mother did not have a stable living environment. She and Father were living for a time with Father's sister, but then were forced to move back to Eureka where they camped at sites and with friends. They also stayed intermittently at Mother's parents' house. According to the Department "[t]he maternal grandparents' residence is not appropriate for [R.E.] to be returned home to. There is often conflict and discord between the parents and grandparents and the parents are often 'kicked out' of the residence. Furthermore the parents reside in a tent on the backside of the house. At this time the parents are living at the maternal grandparents' home and are looking into moving to Fortuna to live with a friend."

With regard to their parenting, despite a referral to a parenting class at the Manila Community Center, parents did not attend this class. Referred to a second parenting

5

class, the parents attended and participated, although they missed class or left early on several occasions.

The Department described the parents as "co-dependent with each other to the level that it impacts their ability to engage in services. [Mother] has not been participating in AOD as she claims she has to care for her husband."

The parents had been given two two-hour supervised visits a week, but had not visited regularly. In fact, they had missed about half their visits. When they did attend, they often left early due to problems with Father's health.

Mother had been arrested twice outside of the location of the supervised visits. "The first time, on or about 7/12/2012, she was hitting her head against a pole and screaming. She was arrested for drunk in public and was taken to SemperVirens. The second incident occurred on 8/6/2012. She was arrested for domestic abuse against [Father]. Law enforcement believed both parents to be under the influence of a control[led] substance, most likely methamphetamines."

The Department also reported inappropriate conversations with R.E., which caused him to "wet his pants, become aggressive, cry, and withdraw[]."

At the time the report was written, however, "the visits are going well and the parents are engaging appropriately with their son during visits." As a result, "this has helped [R.E.] to settle down." In sum, "[a]lthough the parents have been slow in recognizing what they need to do to reunify with their son they appear to be more open to working with the Department and completing what the court has ordered and stabilizing their lives. They appear to be more focused on what their issues are and what they have to do at this time." The Department recommended six more months of family reunification services.

On January 7 and 21, 2013, Mother was evaluated by Dr. Andrew Renouf. Based on his review of her medical and social history, he observed that Mother "has a range of personal and interpersonal characteristics that are similar to characteristics of known physical child abusers and therefore has an increased risk of child abuse compared to the general population. She reported a high degree of personal distress and frustration, and

6

that she feels depressed, worried, worthless, misunderstood, and angry. She reported problems in the family and a distrust of others, which both create stress. Other people are likely to be perceived as undependable and not as a resource."

Renouf described Mother as having failed to "develop the psychological resources and skills to effectively regulate her moods and perceptions of others, and to behave in socially conventional ways. Her moods are likely to shift erratically from normal to depressed, to excitement or anger without clear provocation from external events, and she is prone to self-destructive behavior. Especially sensitive and alert to abandonment, any perceived rejection is likely to be experienced as disproportionately devastating. In part, she may attempt to secure the affection and loyalty of others through being conciliatory, placating, and self-sacrificing. She may experience life as draining and empty, and is likely to believe that she has little in the way of strengths or positive talents."

Renouf noted Mother's uses of substances in the past and possibly in the present "to excess . . . ." He saw her as being in a high level of emotional distress, "likely to have a low tolerance for frustration . . . argumentative, and to have temper outbursts."

Renouf diagnosed Mother as follows: "[Mother] exhibits a chronic and low-level depression that periodically will worsen to a major depression. Her level of depression at the time of assessment was mild but present. The diagnosis of PTSD indicates that she suffered a trauma that she continues to experience through intrusive memories, flashbacks, and nightmares. She attempts to avoid reminders of the trauma because of the distress associated, and is unusually vigilant for potential threats in her environment. The diagnosis of Cannabis Dependence indicates a pervasive pattern of excessive cannabis use with a psychological dependence on the substance." In sum, Mother "exhibits serious symptoms of anxiety, trauma, and depression, and is seriously impaired in her ability to function socially, as a parent, and vocationally."

In an addendum report filed June 4, 2013, the Department noted that Mother and Father had separated. Mother was living with her parents. The Department was concerned about Mother's new boyfriend's criminal history, and expressed these concerns to Mother. At the time, Mother was beginning to see an Alcohol and Other

7

Drug counselor and planned to begin Dual Recovery Program, and meet with a psychiatrist to monitor her medications. Mother had also done two drug screens—one on April 16, 2013 and another on May 27, 2013 and both tested positive for marijuana.

In its status review report for the 12-month permanency planning hearing, the Department noted that Mother had begun regularly attending Dual Recovery Program groups twice a week beginning on June 5, 2013. Her random drug tests have been positive for THC. Mother had not tested positive for methamphetamines. She was meeting weekly with a mental health clinician and saw a physician every two to three months for medication monitoring and since April 2013 had been compliant about attending scheduled mental health appointments. Mother's behavior during visits with R.E. were appropriate.

The Department concluded as follows: "The family has made many changes over the past three months. However, [R.E.] was removed in March 2012 and the family has not been able to engage in their case plan until the parents separated in April 2013. At the writing of this report, the parents do not have housing, their mental health and substance abuse is not stable although they are beginning to engage in services, and visits are only now becoming more focused and consistent. Given the parents' long reported history of AOD abuse and Mental Health issues a 3-4 month period of relative stability is not enough time to find substantial probability of return by the next review. This is especially true in light of the fact that [R.E.] was removed one and a half years ago."

A contested hearing was held on September 4, 2013. At that time, Mother testified that she lived on her parents' property with her boyfriend, Wayne, in a tent. She believed she would eventually be able to move into the house and R.E. would live in the same room with her. She was looking for a job. Mother also discussed her relationship with her new boyfriend, Wayne. They had been dating about five months and were engaged to be married. The social worker was concerned about Wayne. Mother stated that she believed R.E. was more important than Wayne. There was no domestic violence in the relationship and it was positive. Wayne was unemployed and did not support her financially. She understood that he had been convicted of several crimes, including

8

domestic violence. Her visits with R.E. went well. With regard to her marijuana use, she currently used "probably about a bowl or two every other week."

At the conclusion of the hearing, the juvenile court made a number of findings. Of relevance to this matter, the court found that "while the parents have done quite a bit to individually stabilize themselves, that's really the jumping off or starting point to see whether or not there's—what improvements could potentially be made. And the analysis is is there a substantial probability that the child would be returned. And just arguably using the December date, the Court finds there is not a substantial probability. Frankly, there isn't any real probability that in three-month's time all the problems that led to the Court's becoming involved would be to the point that the child could be returned in the matter. And I think that's too bad. [¶] I am happy that the parents are improving their individual lives and have stabilized, but it doesn't relate directly necessarily to the care of the child that, like I said before, the jumping off point."

The court then terminated reunification services and set a section 366.26 hearing for January 2, 2014. This timely writ petition was then filed.

### III. DISCUSSION

Mother's sole contention is that the court erred because it did not extend reunification services to her. We disagree.

Mother was entitled to 12 months of reunification services after R.E. was removed from her custody. (§ 361.5, subd. (a)(1).) "The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within the extended time period or that reasonable services have not been provided to the parent or guardian." (§ 361.5, subd. (a)(3), see also § 366.21, subd. (g).)

To conclude there is a "substantial probability" of return to the parents under section 366.21, subdivision (g)(1), the court must find there was consistent and regular visitation by the parent and "significant progress in resolving problems that led to the child's removal from the home." (§ 366.21, subd. (g)(1)(B).) In addition, the court must find the parent " 'has demonstrated the capacity and ability both to complete the

9

objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being and special needs.' (§ 366.21, subd. (g)(1)(C).)" (*In re T.G.* (2010) 188 Cal.App.4th 687, 695.)

We review the juvenile court's findings and orders for substantial evidence. (*In re Dakota H.* (2005) 132 Cal.App.4th 212.) We draw all reasonable inferences in favor of the court's rulings and affirm them if supported by substantial evidence even if other evidence in the record supports a contrary conclusion. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) It is mother's burden to show that the finding or order is not supported by substantial evidence. (*Ibid.*)

Substantial evidence supports the juvenile court's finding. At the time of the hearing, Mother's volatile living situation in a tent on her parents' property had not changed from the situation in which R.E. was first detained. Similarly, Mother was seeing another problematic man—this time one with a history of domestic violence and criminal behavior. She continued to test positive for marijuana use, and had no real plan for her support beyond vaguely described job applications. Finally, although Mother had completed three months of treatment for her mental health issues, it is clear from the report of Dr. Renouf that Mother's mental health issues were chronic and severe and the court not unreasonably concluded that there was no substantial probability that Mother could address the issues that led to R.E.'s removal during a short additional period of reunification services.

Mother's reply to this evidence is to describe her positive experiences in addressing the problems that led to the dependency—her recent enrollment in drug treatment and mental health programs, her successful visits with R.E., her success in not using methamphetamine, to name a few. The problem with this argument, however, is that although there is certainly evidence of Mother's recent engagement in services and progress on her case plan, on appeal we look to whether substantial evidence supports the juvenile court's finding rather than whether there is evidence to support a contrary finding. And we do conclude that substantial evidence supports the finding.

10

## IV.  DISPOSITION

The petition for extraordinary writ relief is denied on the merits.  (§ 366.26, subd. ( l )(1)(C); Cal. Rules of Court, rule 8.452(h)(1); *see Kowis v. Howard* (1992) 3 Cal.4th 888, 893-895.)  Our decision is final as to this court immediately.  (Cal. Rules of Court, rules 8.452(i), 8.490(b)(3).)

_____
Haerle, Acting P.J.

We concur:


_____
Richman, J.


_____
Brick, J.*



     * Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Consitution.